UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

RYAN P. O'BOYLE,

                    Plaintiff,

          v.                                    Case No. 16-cv-959-pp

GILBERT CARASSCO, *et al.*,

                    Defendants.

**ORDER GRANTING PLAINTIFF'S MOTIONS TO LIFT STAY AND REOPEN
CASE (DKT. NOS. 11, 12, 13, 17, 18), DENYING AS UNNECESSARY
PLAINTIFF'S MOTION TO AMEND COMPLAINT (DKT. NO 14), SCREENING
AMENDED COMPLAINT (DKT. NO. 15) AND DENYING PLAINTIFF'S MOTION
TO APPOINT COUNSEL (DKT. NO. 16)**

          The plaintiff, a state prisoner representing himself, filed this lawsuit in

July 2016. Shortly after filing it, he asked the court to hold off on screening the

complaint until the state court decided a post-conviction motion. Dkt. No. 9.

The court granted that request, administratively closed the case and ordered

the plaintiff to advise this court when the state court had issued a final

decision on his post-conviction motion. Dkt. No. 10.

          On April 11, 2018, the court received a letter from the plaintiff (which he

had written on April 1, 2018), notifying the court that some time in December

2017, he had received the final ruling on his state-court post-conviction

motion. Dkt. No. 11. He explained that after he received that decision, he was

involved in supervision revocation proceedings and federal *habeas* proceedings,

and thus had been delayed in notifying the court that he wanted the court to

1

lift the stay and reopen his case.[1] Id. Six days later, on April 17, 2018, the court received a second copy of the plaintiff's April 1, 2018 letter. Dkt. No. 12. On June 4, 2018, the clerk of court received another letter from the plaintiff (which he'd written on May 30, 2018), again asking the court to lift the stay and reopen the case. Dkt. No. 13. On December 30, 2018, the plaintiff wrote a letter to the clerk of court, asking the court to consider his letter a second motion to lift the stay. Dkt. No. 17. The court received another such letter motion from the plaintiff on February 27, 2019. Dkt. No. 18.

On July 11, 2018, the court received a motion for leave to file an amended complaint and subpoena request; the plaintiff dated that motion July 6, 2018. Dkt. No. 14. Several months later, on September 20, 2018, the court received from the plaintiff his proposed amended complaint. Dkt. No. 15. That same day, the court received the plaintiff's motion asking the court to appoint counsel to represent him. Dkt. No. 16.

This order resolves the plaintiff's motions, lifts the stay, reopens the case and screens his amended complaint.

I.    **Motions to Lift the Stay and Reopen the Case (Dkt. Nos. 11, 12, 13, 17, 18)**

The plaintiff has asked five times for the court to lift the stay it imposed in November 2017 and reopen this case. Dkt. Nos. 11, 12, 13, 17, 18. The court regrets that it has taken this long to act on the plaintiff's requests; the court will grant them and will order the stay lifted and the case reopened.

_____

[1] On December 13, 2017, the plaintiff filed a federal *habeas* petition in this district. O'Boyle v. Humphreys, 17-cv-1746-WCG (E.D. Wis.). Notably, the plaintiff raised in that petition several of the issues he raises in this case. Chief Judge Griesbach dismissed the petition on May 11, 2018 and denied the plaintiff's motion to reconsider on September 6, 2018.

## II.    Motion for Leave to Amend Complaint (Dkt. No. 14)

In his April 1, 2018 letter asking the court to lift the stay and reopen his case, the plaintiff mentioned that while he had not named Officer Joshua P. Martinson and Mr. Ricardo Moran as defendants in his original complaint, they "should be added to it if need be," because he wanted the court to issue subpoenas to these two individuals, as well as Lt. Derrick L. Harris (who was a defendant) for signature samples. Dkt. No. 11. He argued that he could easily prove that his constitutional rights were violated if he had these samples, and if the samples "would be examined by graphologists from OMNI Document Examiners . . . ." Id. In his May 30, 2018 letter, the plaintiff stated that he "requested the complaint be amended to include Officer Joshua P. Martinson and Mr. Ricardo Moran as defendants in order to obtain signature samples from them which will prove beyond a reasonable doubt the legality of [his] seizure." Dkt. No. 13.

In the motion he drafted on July 6, 2018, the plaintiff did what he had not actually done in his prior letters—he specifically asked the court to grant him leave under Fed. R. Civ. P. 15(a) and 19(a) to amend the complaint to add Martinson and Moran. Dkt. No. 14. He said he wanted to add these two defendants "in the interest of justice as it relates to the plaintiff's evidence tampering, Fourth Amendment, Sixth Amendment, and lack of probable cause claims." Id. at 1. He also said he wanted to add them "for the purpose of signature sample acquisition." Id. The motion alleged that "Ricardo Moran's signature on the supplementary report does not resemble his signature on the restitution worksheet." Id. He stated that

> Joshua Martinson testified stating that he had never seen [the plaintiff] in his entire life and that he never saw a photo array. Martinson's signature and writing characteristics closely resemble [defendant] Derrick L. Harris' on the CR-215, 04/07 form, but the

only thing the forms have in common are the reporting officer, Gilbert Carrasco. The CR-215 form was obviously tampered with compared to the other attached CR-215 form . . . .

Id. at 1-2. At the end of the motion, the plaintiff asked the court to allow him to amend the complaint, and to grant his subpoena request. Id. at 2.

The plaintiff did not file a proposed amended complaint until September 20, 2018. Dkt. No. 15. The proposed amended complaint adds Martinson and Moran as defendants. Id. at 1.

Contrary to what the plaintiff appears to believe, he did *not* ask the court for leave to amend the complaint in his April 1, 2018 letter. In the April 1 letter, the plaintiff said that his claims could easily be resolved with writing samples, that he wanted samples from Martinson, Moran and Harris, and that Martinson and Moran "should be added to [the complaint] if need be." Dkt. No. 11. The court does not decide whether it is necessary to add people as defendants; a plaintiff makes that decision, and if a plaintiff decides that it is necessary to add defendants, he cannot just stick extra names in the heading—he must explain what each person did to violate his rights.

There are two ways for a plaintiff to add defendants to a complaint—he can just file an amended complaint, or he can file a motion asking the court for permission to amend the complaint. Which of those methods the plaintiff should use depends on the status of the case. Fed. R. Civ. P. 15(a)(1) allows a party to amend his complaint one time without asking the court for permission, if he does so "21 days after serving it" or 21 days after the other side serves its responsive pleading. Otherwise, the party needs to ask the court's permission to amend the complaint.

Here, the plaintiff has not yet served his complaint, because the court has not yet screened it. Under Rule 15(a), he had the ability to amend his

complaint without asking the court's permission. All he needed to do was what he eventually did in September of 2018—file the amended complaint.

The court will deny as unnecessary the plaintiff's motion for leave to file an amended complaint, because he didn't need the court's permission. He has filed the amended complaint, and the court screens it below.

**III.    Screening the Plaintiff's Amended Complaint (Dkt. No. 15)**

A.    *Federal Screening Standard*

The law requires the court to screen complaints brought by prisoners seeking relief against a governmental entity or officer or employee of a governmental entity. 28 U.S.C. §1915A(a). The court must dismiss a complaint if the plaintiff raises claims that are legally "frivolous or malicious," that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. §1915A(b).

To state a claim, a complaint must contain sufficient factual matter, accepted as true, "that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows a court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556).

To state a claim under 42 U.S.C. §1983, a plaintiff must allege that 1) someone deprived him of a right secured by the Constitution or laws of the United States; and 2) the person who deprived him of that right was acting under color of state law. Buchanan-Moore v. Cty. of Milwaukee, 570 F.3d 824, 827 (7th Cir. 2009) (citing Kramer v. Vill. of N. Fond du Lac, 384 F.3d 856, 861 (7th Cir. 2004)); see also Gomez v. Toledo, 446 U.S. 635, 640 (1980). The court gives a *pro se* plaintiff's allegations, "however inartfully pleaded," a liberal

5

construction. See Erickson v. Pardus, 551 U.S. 89, 94 (2007) (quoting Estelle v. Gamble, 429 U.S. 97, 106 (1976)).

B.    *The Plaintiff's Allegations*

Screening the plaintiff's amended complaint has proved difficult; it is rambling and repetitive, jumping back and forth in time over eight single-spaced pages. While it names twelve defendants, the plaintiff does not tell the court who any of them are—what their roles were in this case, who they work for. He attached several documents to the complaint, forcing the court to have to review the documents (as well as the on-line docket for his criminal case) to try to piece together what happened, and what he is complaining about. The court considered simply instructing the plaintiff to file an amended complaint, but given the amount of time that has passed, has opted instead to do its best with what is on file.

The plaintiff provided the court with a state criminal complaint dated July 15, 2011. Dtk. No. 15-3 at 1-2. Detective Mary Schmitz of the Milwaukee Police prepared the complaint based on her review of reports made by other Milwaukee Police officers. Id. The complaint alleges that on July 9, 2011, officers went to Froedert Hospital to respond to a report of a stabbing. They interviewed Ricardo Moran, who told them that on July 8, 2011, he was stabbed three times (twice in the chest and once in the abdomen) while attending Summerfest with his wife. Id. at 1. The complaint indicates that Moran had identified the plaintiff as the person who stabbed him, "from photos." Id. Assistant District Attorney James C. Griffin signed the complaint. Id. at 2. The complaint bears a stamp reading "FILED CRIMINAL DIVISION 11 JUL 15 PM 12:24 CLERK OF CIRCUIT COURT." Id.

Also attached to the amended complaint is a Form PC-24, Supplementary Report on Photo Array Identification Form, dated July 10, 2011—the day after officers visited Moran at the hospital. Dkt. No. 15-3 at 6. The report identified the victim as Ricardo Moran, and the location of the crime as 200 N. Harbor Drive (known to Milwaukee residents as the Summerfest grounds). Id. It indicates that a photo array was shown to Moran at 10:55 p.m. at his home in Waukesha, Wisconsin. Id. Moran signed the form, attesting that he had selected the person whose photo was in folder #3 as the person who committed the crime. Det. Barbara O'Leary signed the form as the reporting officer. Id. It appears that Moran signed the form in two places. Id.

In the amended complaint, the plaintiff alleges that on July 11, 2015, defendants Gilbert R. Carrasco, Jr., Kristopher M. Maduscha and Michael A. Antoniak entered his home at night without a warrant, demanded to ask the plaintiff questions "by threat of force," put him in handcuffs and arrested him. Dkt. No. 15 at 2, 5. The plaintiff attached a Probable Cause Statement and Judicial Determination, Form CR-215, dated July 11, 2011 at 3:42 a.m. and signed by "Det. Gilbert Carrasco," notarized on that same date. Id. at 9. That document describes what happened at Summerfest on July 8, describes Moran's identification of the plaintiff from the photo array and describes the plaintiff's arrest on July 11, 2011 at 1:30 a.m. Id. The signature of the notary is difficult to make out, but the seal bears the name of defendant Derrick L. Harris; the plaintiff attached a print-out from the Wisconsin Department of Financial Institutions web site identifying a Derrick L. Harris as a registered notary public, with an address of 749 W. State Street, 7th Floor, Milwaukee, WI 53233 (a handwritten note on the printout reads, "District 1 Milw. PD 414-935-7213"). Id. at 13.

The plaintiff attached to the amended complaint a property control sheet, showing that on July 11, 2011—the day of his arrest—Det. Barbara O'Leary checked into evidence a photo array supplemental report, a photo array and data sheet for file #15383, and booking photos for the array at file #15383 "shown to victim." Dkt. No. 15-3 at 3. The victim was identified as Ricardo Moran. The "prisoner" was identified as the plaintiff.

The plaintiff attached a photo array to the amended complaint. It indicates that it was prepared on October 10, 2011 at 8:36 p.m., with "saved file name 15383." Dkt. No. 15-3 at 4. The next document in the packet of materials the plaintiff provided is a list of names and identifying information for six people (the same number of people shown in the October 10, 2011 photo array); the plaintiff's information appears in the fifth position on that sheet. Id. at 5. This sheet indicates that it was prepared on October 10, 2011 at 8:14 p.m. for saved file name 15383. Id. These documents do not state who prepared them.

The plaintiff alleges that Edwin L. Johnson violated his right to counsel on July 12, 2011; the plaintiff says that he repeatedly demanded that an attorney be present, but that Johnson coerced him into answering questions by promising and delivering cigarettes after telling him the Public Defender's office was closed. Dkt. No. 15 at 6. None of the documents attached to the complaint mention Johnson.

The plaintiff provided a second Form PC-24, Supplementary Report on Photo Array Identification Form, dated July 13, 2011. Id. at 8. Again, the form identified the victim as Ricardo Moran and the location of the crime as the Summerfest grounds; it indicates that someone named Joshua P. Martinson was shown a photo array at 9:30 p.m. on July 13, 2011 at 640 S. 84th Street

in Milwaukee (State Fair Park). Id. This person was not able to identify anyone in the array. Id. The reporting officer was Det. Gilbert Carrasco. Id. The plaintiff included in the attachments a printout of an email from a paralegal named Bob Branam at Elite Paralegal Services, to "Chief Bruno" at the email address of James.Bruno@wistatefair.com, dated January 11, 2016. Id. at 14. The email asks "Chief Bruno" for "a signature sample from officer Joshua P. Martinson," who Branam understood was "in [Chief Bruno's] department." Id. A Google search reveals that James Bruno is the chief of the Wisconsin State Fair Park Police Department. Wistatefair.com/wsfp/wsfp-police. The court infers from the email, and from the fact that Bruno is chief of the WSFPD, that defendant Joshua Martinson was an officer of the WSFPD working at Summerfest on July 8, 2011, the date Moran was stabbed.

The Wisconsin Circuit Court Access program shows that the plaintiff made his initial appearance in State v. O'Boyle, 2011CF003261 (Milwaukee County Circuit Court) on July 15, 2011—four days after he was arrested. https://wcca.wicourts.gov. The case was assigned to Judge Yamahiro, and the court set cash bond, which the plaintiff posted on July 21, 2011. Id.

The plaintiff alleges that following his arrest, "the State" did not provide him with a "fair and reliable" probable cause determination "at any time." Id. at 3. He alleges that Det. Carrasco, Derrick L. Harris, Mary Schmitz and ADA Griffin violated "the Federal requirement as per *Gerstein v. Pugh*, 420 U.S. at 125 . . . ." Id. He alleges that the criminal complaint was not filed until "over one hundred and twelve (112) hours post-warrantless arrest," and that Mary Schmitz swore the facts in the complaint without personal knowledge. Id. The plaintiff says that that the photo array used to determine probable cause was not included with "the Probable Cause Statement and Judicial Determination

form CR-215;" he asserts that this means that the form was not "an objectively reasonable basis to determine probable cause." Id. He also alleges that no judge or magistrate ever reviewed or signed the form, and that the form "was tampered with and/or modified." Id. The plaintiff asserts that the photo array used to establish probable cause did not exist at the time of his arrest; he alleges the State created it three months "post bind over" so it could claim it had probable cause to arrest him. Id. at 3, 4, 5. The plaintiff summarizes that he did not have a probable cause hearing within forty-eight hours of his arrest. Id. at 3.

The Circuit Court Access program shows that Judge Laura Gramling Perez conducted a preliminary hearing on July 25, 2011—two weeks after the plaintiff's arrest. https://wcca.wicourts.gov. The plaintiff alleges that ADA Griffin violated his rights by "forc[ing]" him to attend the preliminary hearing "following all of the aforementioned illegal police and government conduct, because the State lacked probable cause to arrest in the first place." Dkt. No. 15 at 3. He says the preliminary hearing violated his right to confront the witnesses against him, when "the District Attorney objected to the relevance of the photo array and [the plaintiff's] alleged identity from it." Id.

The case docket shows that on August 1, 2011, the case was transferred to Milwaukee County Circuit Court judge Dennis R. Cimpl. https://wcca.wicourts.gov. The charges were amended on March 8, 2012, and Judge Cimpl arraigned the plaintiff on the amended charges that same day; the plaintiff entered a plea of not guilty. Id. On May 29, 2012, Judge Cimpl heard testimony on a defense motion that there was no probable cause to arrest the plaintiff; Judge Cimpl denied the motion. Id. The plaintiff had a jury trial from May 29 through June 1, 2012; Judge Cimpl presided over the trial, and at the

end, the jury convicted the plaintiff of attempted second degree intentional homicide while using a dangerous weapon. Id. Judge Cimpl imposed sentence on September 28, 2012. Id.

Included in the documents attached to the amended complaint is a restitution worksheet, dated October 5, 2011 and bearing the signature of Ricardo Moran. Dkt. No. 15-3.

On June 14, 2013, the plaintiff filed a motion seeking post-conviction relief. https://wcca.wicourts.gov. On October 8, 2013, Judge Yamahiro issued an order partially denying the motion and ordering an evidentiary hearing. Id. The plaintiff attached a letter from ADA Griffen to Judge Yamahiro, dated October 22, 2013 and referencing case number 2011CF003261. Dkt. No. 15-3 at 15. The prosecutor related that in his October 8, 2013 order, Judge Yamahiro had ordered an evidentiary hearing "related to the defendant's challenge to the photo array in this case." Id. The prosecutor quoted Judge Yamahiro as having said, "Arguably, counsel was deficient for failing to move to suppress the photo array 'as it related to his probable cause challenge to the defendant's arrest.'" Id. The letter went on to say that Judge Yamahiro "indicated that if there was no probable cause to arrest the defendant, the court would have been obliged to dismiss the complaint for lack of personal jurisdiction and the State would have been obliged to reissue the case." Id. Griffin asked Judge Yamahiro to reconsider his order for an evidentiary hearing, asserting that "even if probable cause for the defendant's arrest did not exist when he was arrested this fact would not have deprived a criminal court of jurisdiction over him." Id. He cited case law holding that an illegal arrest was not a jurisdictional defect depriving the court of personal jurisdiction. Id.

Judge Yamahiro presided over an evidentiary hearing on November 26, 2013. https://wcca.wicourts.gov. Ricardo Moran and Detective O'Leary testified. The plaintiff alleges that defendant Yamahiro violated his rights by not allowing him to confront and contest evidence used against him at an evidentiary hearing, specifically that he sustained Griffin's objection to the admission of a signature sample. Dkt. No. 15 at 6. He asserts that he would have prevailed on his allegations of evidence tampering and conspiracy if Joshua P. Martinson, Ricardo Moran and Harris had provided signature samples and had submitted them to be examined by a graphologist. Id. On December 17, 2013, Judge Yamahiro denied the plaintiff's motion for post-conviction relief. Id.

The amended complaint alleges that ADA Griffin, Judge Cimpl, Judge Yamahiro, Ricardo Moran, Derrick L. Harris, and Det. O'Leary "worked in concert to keep the truth from coming out." Dkt. No. 15 at 5. According to the plaintiff, the "truth" was that the photo array was not prepared until October 10, 2011. Id. The amended complaint alleges that Judges Cimpl and Yamahiro illegally allowed the criminal case to proceed, although the plaintiff repeatedly informed them about the violation of his rights. Id. at 4. He alleges that the court lacked jurisdiction over him, and that neither Cimpl nor Yamahiro are immune from suit. Id. He asserts that Cimpl "ruled in error when he suggested that an arrest warrant was not needed by claiming the police had somehow acquired 'permission to enter' [the plaintiff's] home to arrest." Id. at 5. He alleges that his conviction made "the courts accomplices in disobedience of law." Id.

The plaintiff seeks compensatory damages and punitive damages, as well as injunctive relief. Id. at 7. He also seeks "[a]n order dismissing the case-in-

chief with prejudice when lack of probable cause to arrest is proven." Id. at 8. The court assumes that the plaintiff is asking for dismissal of the state criminal case.

C.   *The Court's Analysis*

1.   Defendant Ricardo Moran

The complaint alleges that the defendants violated the plaintiff's clearly established constitutional rights under color of state law. Dkt. No. 1 at 2. It is true that 42 U.S.C. §1983 prohibits people acting under color of state law from violating another person's constitutional rights. What this means is that "the defendants in § 1983 cases are usually government officials." London v. RBS Citizens, N.A., 600 F.3d 742, 746 (7th Cir. 2010) (citing 7th Cir. 2010) (citing Payton v. Rush-Presbyterian-St. Luke's Med. Ctr., 184 F.3d 623, 628 (7th Cir. 1999)). As best the court can tell, Ricardo Moran isn't a government official. He's a private citizen who had the bad luck to get stabbed while trying to enjoy Summerfest.

In rare circumstances, a plaintiff can sue a private person under §1983, if he can show that "the alleged deprivation of [his] federal rights . . . was caused by the exercise of a right or privilege created by the state, a rule of conduct imposed by the state, or someone for whom the state is responsible," and if he can show that the private party is "a person who may fairly be said to be a state actor." Id. (citations omitted). The plaintiff cannot make that showing as to Moran. He alleges that Moran identified him out of a photo array as the person who had stabbed him. Identifying someone from a photo array does not violate the Constitution, and Moran was not acting as a government official when he made the identification—he was acting as a private citizen.

The plaintiff also alleges that Moran "refused" to submit a handwriting sample. Dkt. No. 15 at 6. This allegation appears to relate to the plaintiff's argument that the Ricardo Moran signature that appears on photo array looks different from the Ricardo Moran signature on the October 5, 2011 restitution form. He attached to the complaint a single page from a court transcript. Dkt. No. 15-3 at 11. There is no date on the transcript page, and no identification of what hearing it comes from. There is an exchange reflected in the transcript:

Q:    Now, Mr. Moran, the district attorney asked you about whether you signed Exhibit 10 and Exhibit 11 up there; is that correct?

A:    Correct.

Q.    Now, there's a difference in your signatures; would you agree with that or not?

A:    Yes.

Q:    And why is that?

A:    One's a fast and one's a formal.

Q:    Okay. Can I approach the witness to write his name, Judge?

MR. GRIFFIN:    I object.

THE COURT;    No. Sustained.

BY MR. KAY:    Why—why would you write your signature different? Well, would you agree your signature appears to be different as compared ---

THE COURT:    --He already agreed to that.

MR. GRIFFIN:    And explained it.

BY MR. KAY:    Is it fair to say that one is in cursive and one is printed?

THE COURT:    They speak for themselves. I can see it.

It is not clear whether the plaintiff believes that someone forged Moran's signature on one of the documents, or on both, or whether he believes that Moran deliberately made his signature look different on the two documents. Either way, as far as the court can tell, it was the prosecutor—ADA Griffin—who objected to the plaintiff's request that Moran provide a handwriting sample, not Moran himself. Even if the plaintiff had asked Moran to provide a handwriting sample and he'd refused, he would have done so as a *private citizen*—a crime victim—not as a state actor. The court will dismiss Moran as a defendant.

## 2. Defendants Cimpl, Yamahiro and Griffin

Defendants Cimpl and Yamahiro are judges. Generally, a judge is immune from a suit for money damages. Mireles v. Waco, 502 U.S. 9 (1991). Such immunity also encompasses an immunity from suit. Id. at 11. There are only two circumstances when a judge is not immune from suit: 1) when the actions that allegedly violated the plaintiff's rights were not taken in the judge's judicial capacity, and 2) when those actions, though judicial in nature, were taken in the complete absence of jurisdiction. Id. at 11-12.

The conduct that the plaintiff alleges violated his rights was conduct within the judicial capacity of Cimpl and Yamahiro: allowing a case to proceed, making rulings on the admissibility or exclusion of evidence, and making legal rulings generally. None of the actions of which the plaintiff complains were taken by Judge Cimpl or Judge Yamahiro outside of their judicial capacity, so that exception to judicial immunity does not apply here.

The plaintiff alleges that the judges did not have jurisdiction over the case—the second circumstance in which a judge is not protected by judicial immunity—because there was no probable cause to arrest him in the first

place. The plaintiff misunderstands "jurisdiction." "'Jurisdiction' refers to 'a court's adjudicatory authority,' . . .. Accordingly, the term 'jurisdictional' properly applies only to 'prescriptions delineating the classes of cases (subject-matter jurisdiction) and the persons (personal jurisdiction)' implicating that authority." Reed Elsevier, Inc. v. Muchnick, 559 U.S. 154, 154 (2010) (internal citation omitted).

Wisconsin circuit courts, including the Milwaukee County Circuit Court on which Judges Cimpl and Yamahiro sit, have original jurisdiction over alleged violations of Wisconsin criminal statutes. W.S.A. Const. Art. 7, §8. The state criminal complaint the plaintiff provided shows that he was charged with violating Wis. Stat. §§941.30(1) (first-degree recklessly endangering safety), 939.50(3)(f) (classifying the previous offense as a Class F felony), and 939.63(1)(b) (possession of a dangerous weapon sentencing enhancer).[2] Dkt. No. 15-3 at 1-2. These are Wisconsin criminal statutes, and under the Wisconsin Constitution, Judge Cimpl and Yamahiro had jurisdiction over a case charging those violations.

This appears to be what ADA Griffin was arguing to Judge Yamahiro in his October 22, 2013 letter—that even if there were problems with Moran's identification of the plaintiff from the photo array, and even if the officers who arrested the plaintiff didn't have probable cause to do so, that would not have deprived the court of *jurisdiction*. The Wisconsin Supreme Court has rejected the argument that an illegal arrest deprives a court of personal jurisdiction.

---

[2] The Wisconsin Circuit Court Access Program shows that, following a jury trial, the defendant was convicted of violating Wis. Stat. §940.05(1), attempted second-degree intentional homicide, also a Wisconsin criminal statute. See State v. O'Boyle, Case No. 2011CF003261 (Milwaukee County Circuit Court), available at https://wcca.wicourts.gov (last visited January 30, 2019).

Wisconsin v. Moats, 457 N.W.2d 299, 306 (Wis. 1990) (citing State *ex rel.* Zdanczewicz v. Snyder, 388 N.W.2d 612 (1986)). "[T]he existence of a valid complaint supported by probable cause defeated any claim by the defendant that the circuit court lost personal jurisdiction over him due to an illegal arrest." Id. The plaintiff has attached a complaint that states probable cause. Even if it had turned out later that probable case had not existed, Judges Cimpl and Yamahiro still would have had jurisdiction. The court will dismiss Cimpl and Yamahiro as defendants because they are immune from suit.

The same is true for Assistant District Attorney James C. Griffin. A prosecutor has absolute immunity from liability for his prosecutorial activities. Imbler v. Pachtman, 424 U.S. 409, 431 (1976); Davis v. Zirkelbach, 149 F.3d 614, 617 (7th Cir. 1998). While a prosecutor is entitled to only qualified immunity when the prosecutor's conduct is administrative or investigatory in nature, Buckley v. Fitzsimmons, 509 U.S. 259 (1993); see also Hunt v. Jaglowski, 926 F.2d 689 (7th Cir. 1991), the plaintiff does not claim that Griffin's actions were administrative or investigatory. The plaintiff claims that Griffin signed off on the complaint (made a determination that there was probable cause to charge the plaintiff with a crime), objected to the admission of evidence (raised legal challenges to the admission of evidence) and objected to the plaintiff's efforts to obtain signature samples (took a legal position), defended the State's legal positions, and prosecuted the plaintiff. All these activities are "prosecutorial activities"—they are the *definition* of prosecutorial activities. Imbler, 424 U.S. at 425-26. The fact that the plaintiff disagrees with Griffin's probable cause determination, evidentiary and legal positions and decision to proceed with the prosecution does not change the fact that Griffin

took those actions in his capacity as a prosecutor, which makes him immune from suit. The court will dismiss Griffin.

### 3. Defendant Derrick Harris

The amended complaint does not identify Derrick L. Harris or say for whom he worked. In his April 1, 2018 letter to this court, the plaintiff referred to Harris as "Lt. Derrick L. Harris." The plaintiff attached to the amended complaint a "memo" dated January 12 (no year) to "Ryan"—the plaintiff—from "Bob." Dkt. No. 15-3 at 12. (The court believes that "Bob" is paralegal Bob Branam of Elite Paralegal Services; the memo has "EPS" stamped above the word "Memo," and the plaintiff attached an email from paralegal Branam to the amended complaint. Dkt. No. 15-3 at 13. Based on the date in the email, the court suspects that the memo was written January 12, 2016.) The memo says that "Bob" "just got off the phone with Derrick L. Harris whom is a Lt. with the Milw. PD and is a notary." Dkt. No. 15-3 at 12. It indicates that Harris "will not provide a signature sample and directed [Bob] to his supervisor." Id.

The amended complaint does not explain how Harris violated the plaintiff's rights, other than to say that Harris "worked in concert" with Griffin, Cimpl, Yamahiro, Moran and O'Leary "to keep the truth from coming out." Dkt. No. 15 at 5. The documents attached to the complaint show that Harris notarized Carrasco's signature on the July 11, 2011 probable cause statement. It appears that the plaintiff may have retained a paralegal to ask Harris for a signature sample in early 2016. He has argued to this court that he wants Harris to provide a signature sample, and says that if a graphologist could example Harris's signature sample, the plaintiff would prevail on his "allegations of evidence tampering, forgery, conspiracy, false imprisonment,

lack of probable cause, and illegal seizure," and all the charges against him would have been dropped. Dkt. No. 15 at 6.

If the plaintiff wants a sample of Harris's signature because he believes that Harris did not sign the probable cause statement, the court can't figure out how Harris could have violated the plaintiff's constitutional rights. If Harris didn't notarize the probable cause statement, he had no part in the criminal case that the court can see. On the other hand, if the plaintiff thinks that Harris *did* notarize Carrasco's signature, then the court can't figure out why he wants a sample of Harris's signature. And if the plaintiff believes that Harris *did* notarize Carrasco's signature, the court can't figure out how that action violated the plaintiff's constitutional rights. When a notary notarizes someone's signature, the notary is swearing that he or she knows personally that the signature belongs to the person to whom it purports to belong. The court cannot figure out how Harris's swearing that Carrasco's signature belonged to Carrasco violated the plaintiff's rights. Even if the plaintiff is asserting something along the lines of, "Harris notarized Carrasco's signature even though he did not see Carrasco sign," or "Harris notarized Carrasco's signature but it wasn't really Carrasco's signature," those would be violations of the Wisconsin notary statute, not the federal constitution. And the plaintiff would have to prove that he was injured or damaged by Harris's conduct. See May v. Rich, 375 Fed. App'x 592, 593-94 (7th Cir. 2010). The court will dismiss Derrick L. Harris as a defendant.

### 4. Defendant Joshua P. Martinson

The only statement the plaintiff makes regarding Martinson, the State Fair guard who was unable to pick anyone from a photo array, is that "[h]ad Joshua P. Martinson . . . provided signature samples to be examined by a

graphologist," the plaintiff would have been able to prove all his allegations of evidence tampering and forgery and other wrong-doing, and "all charges would have been dropped." Dkt. No. 15 at 6. The court has questions about whether Martinson was a state official acting under color of state law, but even if he was, the plaintiff's argument is illogical. The July 13, 2011 supplemental photo array report shows that Martinson was not able to pick anyone—including the plaintiff—out of the photo array he was shown. Why the plaintiff believes that Martinson didn't sign this report, the court does not know. Why the plaintiff thinks that proving Martinson did not sign the report will prove that his constitutional rights were violated, the court does not know. The plaintiff has not stated any kind of claim against Martinson, and the court will dismiss him.

5. Defendants O'Leary, Schmitz, Carrasco, Maduscha, Antoniak and Johnson

In <u>Heck v. Humphrey</u>, 512 U.S. 477, 487 (1994), the Supreme Court explained that a plaintiff cannot bring a claim under §1983 if a ruling in his favor on the claim "would necessarily imply the invalidity of [the state court] conviction or sentence." If a ruling by this court in favor of the plaintiff on a claim would result in his conviction being invalidated, this court *must* dismiss that claim. That is because §1983 allows people to sue for certain, specific kinds of "torts"—personal injuries. <u>Id.</u> at 483 (citations omitted). The Supreme Court has held that "civil tort actions are not appropriate vehicles for challenging the validity of outstanding criminal judgments . . . ." <u>Id.</u> at 485.

At first blush, *all* the plaintiff's claims sound like <u>Heck</u>-barred claims. He says in his request for relief that he wants an order dismissing the "case-in-chief," presumably the underlying criminal case. Dkt. No. 15 at 8. He states over and over that if the defendants had not done this or that, he would not have been arrested at all, or charged at all, or the charges against him would

20

have been dropped. To the extent that the plaintiff is asking this court to vacate or invalidate his conviction, or grant him a new trial, Heck bars the court from granting such requests.

The Seventh Circuit has held that Fourth Amendment claims, such as unlawful entry and unlawful arrest, survive Heck "because misconduct by the police does not (at least, need not) imply the invalidity of any particular conviction." Moore v. Burge, 771 F.3d 444, 446 (7th Cir. 2014) (internal citations omitted). If the "injuries complained of were inflicted before there had been a judicial determination of probable cause," such claims are properly brought under the Fourth Amendment, and Heck does not bar them. Hill v. Murphy, 785 F.3d 242, 244-245 (7th Cir. 2015). Claims such as illegal entry, unlawful detention, unlawful seizure of evidence fall into this category of non-Heck-barred claims. Id. at 244.

a.   **Defendant Barbara O'Leary**

The plaintiff made the same, sole allegation against O'Leary that she made against Harris: that O'Leary "worked in concert" with Griffin, Cimpl, Yamahiro, Moran and Harris to keep "the truth from coming out." Dkt. No. 15 at 5. Presumably this allegation relates to his argument that there *was* no photo array in existence on July 10, 2011 (the date the photo array was shown to Moran). As far as the court can figure out, the plaintiff's argument stems from the fact that the date on the photo array he attached to the amended complaint—the one that contains his photo and information—was October 10, 2011, while the supplemental photo array report indicated that Moran viewed the array, and picked out the plaintiff, on July 10, 2011—three months

earlier.[3] The plaintiff appears to believe that O'Leary (the officer who signed the photo array report) and Moran lied about Moran seeing the photo array and picking out the plaintiff on July 10, 2011, and that this lie was used as the probable cause for the plaintiff's arrest. The plaintiff reasons that this means there was no probable cause for his arrest on July 11, 2011. The court interprets this as a claim that O'Leary caused him to be arrested without probable cause in violation of the Fourth Amendment. The court will allow him to proceed on this claim.

b. **Defendants Carrasco, Maduscha and Antoniak**

The plaintiff asserts that Carrasco, Maduscha and Antoniak illegally entered his home without a warrant on January 11, 2011. "[T]o bring a Fourth Amendment action for an unlawful search (or entry), a plaintiff must have a legitimate expectation of privacy that society recognizes as reasonable." Bentz v. City of Kendallville, 577 F.3d 776, 781 (7th Cir. 2009) (citations omitted). "It is, therefore, the government's unlawful *invasion* of this privacy that gives rise to a Fourth Amendment violation." Id. at 782. The plaintiff alleges that Carrasco, Maduscha and Antoniak entered his home. "Physical entry of the home is the chief evil against which the wording of the Fourth Amendment is

---

[3] The plaintiff also gave the court three photo arrays which are not related to his case. Dkt. No. 15-3 at 21-26. The plaintiff does not explain why he attached these unrelated arrays, but he provides an affidavit from someone named Reginald Clytus, talking about what time stamps on photo arrays mean. Id. at 19-20. The plaintiff does not explain who Clytus is, but Clytus says that one of the photo arrays was used against "a co-defendant," and he mentions a photo array "used in my case." Id. at ¶¶2-3. The court speculates that the plaintiff believes Clytus's affidavit, and the photo arrays from other cases, demonstrate that the photo array in his case was tampered with. The court does not understand why the plaintiff is alleging that his array was "tampered with;" that argument seems to contradict his argument that it was created three months after it was shown to Moran. Regardless, if such evidence is relevant, it is relevant at the summary judgment stage, not at screening.

directed," <u>Payton v. New York</u>, 445 U.S. 573, 585 (1980); the plaintiff had a reasonable expectation of privacy in his home. His allegation that the three officers entered his home without a warrant and with no exigent circumstances is sufficient to state a Fourth Amendment claim for unlawful entry against Carrasco, Maduscha and Atoniak.

The plaintiff also alleges that Carrasco, Maduscha and Antoniak illegally arrested him. An arrest is unlawful if there is no probable cause to support it. <u>Jones v. Webb</u>, 45 F.3d 178, 181 (7th Cir. 1995). As discussed above, the plaintiff appears to claim that O'Leary falsified a report indicating that Moran had picked the plaintiff out of a photo array, and therefore that Carrasco, Maduscha and Antoniak arrested him without probable cause. The court will allow him to proceed on a Fourth Amendment illegal arrest claim against these defendants.

c.     **Defendant Mary Schmitz**

The plaintiff alleges that Detective Mary Schmitz, the detective who swore out the complaint against the plaintiff on July 15, 2011, had no personal knowledge of the facts to which she swore. Dkt. No. 15 at 3. The plaintiff does not explain how this violated his constitutional rights, other than to cite <u>Gerstein v. Pugh</u>, 420 U.S. 103 (1975), <u>County of Riverside v. McLaughlin</u>, 500 U.S. 44 (1991), and <u>State v. Koch</u>, 175 Wis.2d 684 (Wis. 1993).

In <u>Gerstein</u>, the Supreme Court held that a prosecutor's assessment of probable cause is not enough to detain someone, and that the Fourth Amendment requires a "timely judicial determination of probable cause as a prerequisite to detention." <u>Gerstein</u>, 420 U.S. at 126. Twenty-six years later, in <u>McLaughlin</u>, the Court clarified what they meant by "timely," holding that "judicial determines of probable cause within 48 hours of arrest will, as a

general matter, comply with the promptness requirement of *Gerstein*."
McLaughlin, 500 U.S. at 56. Koch held that the McLaughlin 48-hour rule
applied in Wisconsin. 175 Wis.2d at 698-99.

It is not clear how the plaintiff's allegation that Schmitz did not have
personal knowledge of the facts in the complaint relates to the 48-hour
requirement. If the plaintiff is trying to assert that Schmitz somehow misled
ADA Griffin into issuing the complaint, the evidence shows otherwise—Schmitz
stated right in the complaint that she was basing the information in the
complaint on "information and belief and upon a review of official police reports
prepared by fellow City of Milwaukee Police officers." Dkt. No. 15-3 at 1.

To the extent, however, that the plaintiff is trying to allege that Schmitz
had something to do with the fact that he was detained even though he did not
receive a probable cause hearing within forty-eight hours of his July 11, 2011
arrest, the court will allow him to proceed against her on that claim. Read
broadly, the amended complaint and the probable cause statement support a
similar claim against Carrasco. Carrasco was involved in the plaintiff's arrest
on July 11, 2011. He signed the probable cause statement on July 11, 2011 at
3:42 a.m. Yet the complaint did not issue until four days later. To the extent
that the plaintiff is arguing that Carrasco had something to do with that delay,
the court will allow him to proceed against Carrasco on his Fourth Amendment
claim that he was unlawfully detained without a timely probable cause hearing.

### d. **Defendant Johnson**

Finally, the plaintiff alleges that Johnson (whom the court can only
assume was an officer or detective with the Milwaukee Police Department)
coerced him into making statements by telling him that the Public Defender's
Office was closed and getting him cigarettes. He also alleges that Johnson

violated his Fifth Amendment right to have counsel present during interrogation by questioning him after he'd asked for a lawyer. (As part of its protection against self-incrimination, the Fifth Amendment provides the right to have counsel present during a custodial interrogation. <u>Winsett v. Washington</u>, 130 F.3d 269, 278 (7th Cir. 1997) (citations omitted)). The plaintiff says that Judge Cimpl granted his motion to suppress these statements, ADA Griffin referred to them in his closing statement at trial.

The court cannot tell from the amended complaint whether the plaintiff's claim against Johnson is <u>Heck</u>-barred. The court does not know what the plaintiff told Johnson. The court does not know what Griffin said in his closing statement. In <u>Hill</u>, the Seventh Circuit indicated that a plaintiff's Fifth Amendment claim that officers coerced him into incriminating himself was not <u>Heck</u>-barred because, looking at all the other evidence the state had against the plaintiff, the court concluded that ruling in favor of the plaintiff on that claim would not have invalidated the plaintiff's conviction. <u>Hill</u>, 785 F.3d at 245-250. At this early stage, the court will allow the plaintiff to proceed against Johnson on his Fifth Amendment self-incrimination claim and his Sixth Amendment claim.

## IV.    Motion to Appoint Counsel (Dkt. No. 16)

The court will deny the plaintiff's motion to appoint counsel. The plaintiff indicated that the court should appoint him a lawyer because he can't afford to hire one himself, he is in prison, he has limited access to the law library, he will need expert testimony regarding signature samples and his trial will involve conflicting testimony. He asks the court to appoint Gregg H. Novack or William M. Cannon to represent him. Dkt. No. 16.

In a civil case, the court has the discretion to recruit counsel for individuals unable to afford one. Navejar v. Iyola, 718 F.3d 692, 696 (7th Cir. 2013); 28 U.S.C. §1915(e)(1); Ray v. Wexford Health Sources, Inc., 706 F.3d 864, 866-67 (7th Cir. 2013). First, the plaintiff must make reasonable efforts to hire counsel on his own. Pruitt v. Mote, 503 F.3d 647, 653 (7th Cir. 2007). In this district, he can show that he has done this by providing evidence that he has contacted at least three attorneys who either didn't respond to him, or declined to represent him. He can do this by providing copies of letters he receives from the lawyers, or by providing the court with the names of the people he contacted and explaining how long he waited without receiving an answer.

After the plaintiff demonstrates that he has made those efforts, the court must decide "whether the difficulty of the case—factually and legally—exceeds the particular plaintiff's capacity as a layperson to coherently present it." Navejar, 718 F.3d at 696 (citing Pruitt, 503 F.3d at 655). The court looks, not only at a plaintiff's ability to try his case, but also at his ability to perform other "tasks that normally attend litigation," such as "evidence gathering" and "preparing and responding to motions." Id. "[D]eciding whether to recruit counsel 'is a difficult decision: Almost everyone would benefit from having a lawyer, but there are too many indigent litigants and too few lawyering willing and able to volunteer for these cases.'" Henderson v. Ghosh, 755 F.3d 559, 564 (7th Cir. 2014) (quoting Olson v. Morgan, 750 F.3d 708, 711 (7th Cir. 2014)).

The plaintiff stated only that he had "made repeated efforts to raise funds and otherwise obtain adequate representation, but has heretofore failed to find an attorney willing to take the case." Dkt. No. 16 at 2. That is not sufficient; for the court to consider appointing counsel, a plaintiff must provide the court

with some proof that he has tried to contact at least three lawyers without success.

Even if the plaintiff had provided the court with proof that he'd tried to contact three lawyers, however, the court would deny his motion at this stage. The court does not have money to pay lawyers to represent inmate plaintiffs. Almost every incarcerated plaintiff in this district—and there are *many*—ask the court to appoint them a lawyer, and there are not enough volunteer lawyers to represent them. Most of the incarcerated plaintiffs do not have money to hire lawyers, have no legal education, have limited access to the law library, believe they need expert testimony and investigation and believe that their trials will be complicated. These reasons, standing alone, are not sufficient for the court to appoint counsel to represent someone.

The next step in the case is that the court will have the amended complaint served on the defendants. The defendants then will get a certain amount of time to either answer the complaint or file a motion to dismiss it. If they answer the complaint, the court will issue a scheduling order, setting out deadlines for the parties to conduct discovery and file motions. If the defendants file a motion to dismiss the case, the plaintiff will have the opportunity to object to that motion. Either way, there is not much for the plaintiff to do at this point, and the court believes that he can handle the litigation himself at this stage.

## V.      Request for Subpoenas (Dkt. No. 11)

In his April 1, 2018 motion asking the court to lift the stay and reopen the case, the plaintiff stated that his claims could be resolved easily if the court would issue subpoenas to "Lt. Derrick L. Harris, Officer Joshua P. Martinson and Mr. Ricardo Moran;" he wants the court to order these people to provide

samples of their signatures. Dkt. No. 11. The motion says that the plaintiff tried to get samples from Harris and Martinson in 2016, and that the "Circuit Court" refused to allow Ricardo Moran to "provide defense with signature samples at an evidentiary hearing held in November 2013 . . . ." Id. At the end of the motion, he asked the court to "grant [his] request for subpoena power." Id.

In his May 30, 2018 letter, the plaintiff said that he had asked the court to amend the complaint to add Martinson and Moran "as defendants in order to obtain signature samples from them which will prove beyond a reasonable doubt the legality of [his] seizure." Dkt. No. 13. The plaintiff then stated, "[a] request for a subpoena to that end was requested, but I am not certain if that is part of the process in §1983 suits." Id. Nonetheless, he repeated his request that the court grant his request for subpoena power. Id. He repeated the request again in his motions for leave to amend the complaint. Dkt. Nos. 14, 17, 18.

The court will deny the plaintiff's requests for subpoenas. A §1983 case allows a plaintiff to sue for damages for violations of his constitutional rights. As the court discussed above, it does not allow him to try to invalidate his conviction, or to prove that he should not have been convicted. The court has dismissed Harris, Martinson and Moran as defendants, and it has explained that as to Harris and Moran, it cannot see how signature samples from them would prove the plaintiff's claims of constitutional violations.

## VI. Relief Requested

Finally, even though the court is allowing the plaintiff to proceed with some of his claims, he should be aware that he has requested some forms of relief that this court cannot give even if he wins the lawsuit. The court cannot

order people to apologize, or to sign documents agreeing with the plaintiff's views on decency and justice.

## VII.    Conclusion

The court **GRANTS** the plaintiff's motions asking the court to lift the November 27, 2017 stay and reopen the case. Dkt. Nos. 11, 12, 13, 17, 18.

The court **ORDERS** that the stay imposed on November 27, 2017 is **LIFTED**, and **ORDERS** that the clerk's office shall **REOPEN** the case for further proceedings.

The court **DENIES** the plaintiff's requests for subpoenas. Dkt. Nos. 11, 12, 13, 17, 18.

The court **DENIES AS UNNECESSARY** the plaintiff's motion for leave to amend the complaint. Dkt. No. 14.

The court **DENIES WITHOUT PREJUDICE** the plaintiff's motion for appointment of counsel. Dkt. No. 16.

The court **ORDERS** that Dennis R. Cimpl, Glenn Yamahiro, James C. Griffin, Joshua P. Martin, Ricardo Moran, and Derrick L. Harris are **DISMISSED** as defendants.

Under an informal service agreement between Milwaukee County and this court, the court **ORDERS** that copies of the plaintiff's amended complaint and this order will be electronically transmitted to Milwaukee County for service on defendants Gilbert Carrasco, Kristopher M. Maduscha, Michael A. Antoniak, Barbara O'Leary, Mary Schmitz and Edwin L. Johnson. The court **ORDERS** those defendants to file a responsive pleading to the complaint within sixty days of receiving electronic notice of this order.

The court will issue a separate order **REFERRING** this case to Magistrate Judge Nancy Joseph for all pretrial proceedings.

The court **ORDERS** that the parties may not begin discovery until after the court enters a scheduling order setting deadlines for discovery and dispositive motions.

The court **ORDERS** the plaintiff to mail all correspondence and legal material to:

> Office of the Clerk
> United States District Court
> Eastern District of Wisconsin
> 362 United States Courthouse
> 517 E. Wisconsin Avenue
> Milwaukee, Wisconsin 53202

PLEASE DO NOT MAIL ANYTHING DIRECTLY TO THE JUDGE'S CHAMBERS. It will only delay the processing of the case.

The court advises the plaintiff that, if he fails to file documents or take other required actions by the deadlines the court sets, the court may dismiss the case based on his failure to prosecute. The parties must notify the clerk of court of any change of address. Failure to do so could result in orders or other information not being timely delivered, thus affecting the legal rights of the parties.

Dated in Milwaukee, Wisconsin this 12th day of March, 2019.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**United States District Judge**